**ORIGINAL**

Of Counsel:

CRONIN, FRIED, SEKIYA,
 KEKINA & FAIRBANKS

PATRICK F. McTERNAN    4269-0
HOWARD G. McPHERSON   5582-0
600 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaii 96813
Telephone: (808) 524-1433
Facsimile: (808) 536-2073
E-mail: cfskf@croninfried.com

MCGUINN, HILLSMAN & PALEFSKY

JOHN R. HILLSMAN (*Pro Hac Vice*)
535 Pacific Avenue
San Francisco, California 94133
Telephone: (415) 421-9292

Attorneys for Plaintiff

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

SEP 0 8 2006

at 10 o'clock and 00 min __ M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CHRISTOPHER MacDONALD, | CIVIL NO. 02-00084 LEK |
| Plaintiff, | PLAINTIFF'S POST-REMAND OPENING BRIEF; CERTIFICATE OF SERVICE |
| vs. | |
| KAHIKOLU, LTD., dba Frogman Charters, | HEARING: <br> DATE: October 27, 2006 <br> TIME: 9:30 a.m. <br> JUDGE: Hon. Leslie E. Kobayashi |
| Defendant. | Trial: May 20-22, 2003 |

<u>PLAINTIFF'S POST-REMAND OPENING BRIEF</u>

I.   <u>INTRODUCTION</u>

The Ninth Circuit has returned this case with instructions that Your Honor "determine whether the failure of Kahikolu to comply with Coast Guard regulations played any part 'even the slightest' in producing Mr. MacDonald's injuries and enter a new judgment in accordance with that finding." *MacDonald v. Kahikolu, Ltd.*, 442 F.3d 1199, 1203 (9th Cir. 2006).

The first step is deciding whether admiralty's venerable *Pennsylvania* Rule applies. We are confident the Court will find that it does.

II.   <u>ARGUMENT</u>

A.   <u>Causation Under The *Pennsylvania* Rule</u>

In *Mathes v. The Clipper Fleet*, 774 F.2d 980 (9th Cir. 1985), a Jones Act personal injury case, the court restated the Rule:

> Under the *Pennsylvania* Rule of maritime law, when a vessel operated in violation of a statute is involved in an accident, the burden rests upon the ship of showing not merely that her fault may not have been one of the causes, or that it probably was not, **but that it could not have been.** Such a rule is necessary to enforce obedience to the mandate of the statute.

*Mathes*, 774 F.2d at 981 (emphasis added).

Kahikolu does not dispute its vessel was operated in violation of a statute, nor that it was involved in an accident, i.e., Chris MacDonald's injury.

2

Instead, in an effort to avoid the difficult burden of proof imposed by the Rule, Kahikolu contends, despite *Mathes*, that it does not apply in the Ninth Circuit to Jones Act personal injury cases.

In *Marine Solution Services v. Horton*, 70 P.3d 393 (Alaska 2003), that proposition was explicitly rejected:

> ***MSS argues that the Rule does not apply to personal injury or Jones Act cases. We disagree.*** Although the Rule arose in a case that involved a vessel collision, it has been extended to non-collision cases. For example, ***the Ninth Circuit, which has frequently employed the Rule, has applied the Rule in Jones Act personal injury cases.*** In *Mathes v. The Clipper Fleet*, a seaman was injured while transferring cargo between two ships. He brought a Jones Act claim and argued that the Rule should apply because the captain did not have his credentials physically aboard the ship as required by Coast Guard regulations. The court concluded that the Rule did not come into play "because there is no conceivable connection between the violation and the injury." ***In other words, the court assumed the Rule applied in the Jones Act case but then concluded that there was no nexus between the violation and the injury.*** Other circuits have been more emphatic that the Rule applies in non-collision cases. In *United States v. Nassau Marine Corp.*, the Fifth Circuit explicitly stated that "[t]he [*Pennsylvania*] Rule does not apply only to collisions. The Fifth Circuit later explained that "the rule has been reformulated to apply to any 'statutory violator' who is a 'party to a maritime accident.'" ***We adopt the majority position set forth by the Ninth Circuit in Mathes*** that the Rule applies if there is a nexus between the violation and the injury. The trial court's application of the Rule here was not erroneous.

*Id.* at 406-07 (footnotes omitted, brackets by the court--emphasis added).

3

The Alaska Supreme Court's reading of *Mathes* is simple and persuasive. If Your Honor agrees and adopts the Alaska Court's reading, i.e., that the Ninth Circuit applies the Rule in Jones Act cases, it simply ends the parties' dispute on this point – whatever Kahikolu may argue to the contrary. Applicability of controlling precedent leaves no room for further discussion. *MacDonald,* 442 F.3d at 1202, quoting *Hart v. Massanari,* 266 F.3d 1155, 1171 (9th Cir. 2001) ("Obviously, binding authority is very powerful medicine").

In turn, applicability of the *Pennsylvania* Rule effectively resolves the remand question – because Kahikolu is then tasked with proving not only that its admitted violation of Coast Guard regulations probably did not contribute to Chris MacDonald's injury, but that they *could not* have contributed.

That burden is difficult. *Waterman S.S. Corp. v. Gay Cottons,* 414 F.2d 724, 736 (9th Cir. 1969) ("***extremely difficult, if not impossible***"); *Reyes v. Vantage S.S. Co. Inc.,* 609 F.2d 140 (5th Cir. 1980) ("the causative element in Jones Act cases is less than the common law standard. . . . Combining this slight standard of causation with the presumption of causation to which the plaintiff is here entitled means that on remand the shipowner must show that the ship's . . . regulatory violations ***could not have been even a contributing cause***") (emphasis added).

And the record clearly shows Kahikolu's non-compliance with the Coast Guard diving regulations could have contributed to this accident.

4

<u>Without</u> a required diving operations manual Kahikolu: (1) had no rule on safe descent rates for its divers, (2) did not require its divers to report illness that might affect their safe diving ability, such as a simple head cold, and (3) fostered significant, unrestrained competition among its divers.

<u>With</u> an operations manual, Kahikolu instead: (1) would have had a standing rule on utilizing a safe descent rate, to minimize hyperbaric injuries of the kind suffered by Chris MacDonald, (2) would have required all of its divers to report head colds or other illness bearing on their diving fitness, and (3) would have replaced competition with positive peer pressure toward safe practices.

All of these points are amply supported by the evidence.

1.   <u>Safe Descent Rate</u>

Mr. MacDonald testified he was given no instruction on proper descent rates. Trial Record ("TR") at 3-137 (Volume and Page number) ("Q. And during your time with the Frogman company, did anyone give you any training at all on the proper rate of descent during a dive? A. No, no one showed me how to go down fast or slow. There was no speed, no discussion, no"). Kahikolu's head captain Sean Hunadi effectively confirmed it. TR 3-109 ("Q. During the new hire orientations that you gave Chris, did you ever give him any instructions on descent rates? . . . A. You can't really descend quicker than anybody else").

Plaintiff's expert Mark Almaraz testified, without contradiction from any other witness, on the importance of safe descent rates. TR 3-173 ("By descending at a slower rate, it allows you time to clear your ears slowly or gently, and in the event you're having problems clearing your ears, it allows you time to come up just a few feet and equalize your ears again and continue your dive").

In contrast, Kahikolu's own expert Dr. Jackler testified about the inherent hurry and risk entailed in a free diving descent. TR 3-58 ("You have a great deal of motivation to get down quickly and up quickly, you tend to push. You're not – you don't have the luxury as you would wearing scuba of stopping at 8 feet or 12 feet"). Mr. Almaraz also testified on this point. TR 3-173 ("Q. . . . We can agree that a free diver making a dive on one breath of air doesn't have the luxury of descending at the rate of 70 feet per minute? A. Yes").

The Court received an exemplar diving operations manual in evidence, of the type required by Coast Guard regulations, as Exhibit BB.

That document contained the following provision:

> **6.1 GENERAL PREVENTION AND SAFETY CONSIDERATIONS**
> * * *
>
> - Prevent ear injuries by ascending at a rate of no more than 60 feet per minute ***and by descending at a rate of no more than 70 feet per minute***.

Trial Exhibit BB at 25 (emphasis added).

6

The lack of an operations manual specifying safe descent rates, by itself, precludes Kahikolu from carrying its burden under the *Pennsylvania* Rule. There is simply no way to prove that the lack of a manual containing a safe descent rate could not possibly have been a contributing cause of Chris MacDonald's injury.

2.   <u>Mandatory Illness Reporting</u>

The exemplar manual also contained an illness reporting provision:

> **3.0   PRE-DIVE PROCEDURES**
>
> **3.1   PRE-DIVE DIVERS**
>
> Upon start of the work shift the Divers will:
>
> 1) Inform the Lead Diver or Senior Pilot / Lead Technician of any physical or physiological illness or dysfunction that they may have which could hamper their ability to dive. See the examples that follow:
>
>    - ***Any illness that could hamper diving abilities.***
>
>    - Any medications that are currently being taken.
>
> * * *

Trial Exhibit BB at 14 (emphasis added).

During the trial Kahikolu made a point of trying to show, through its expert Dr. Jackler, that there was evidence Chris MacDonald was still suffering from sinusitis (inflamed nasal membrane) at the time of the subject accident, and that this

could have played a contributing role in the accident. TR 3-59. ("Q. . . . Let's then turn our attention briefly to the sinusitis. Did you note anything in the record that suggested that Chris MacDonald's sinusitis was still active on September 24 . . .? A. Yes. . . . Yes, I did see evidence."); TR 3-66 ("Q. . . . Doctor, if I heard you correctly, you said that his boggy, thick mucosa caused by the sinusitis probably contributed to the problems in opening the Eustachian tube without the plaintiff knowing it, did I get that right? A. It may have, yes").

In other words, Kahikolu sought to prove that a lingering cold could have contributed to Chris not being able to equalize his ears easily.

The fact that Kahikolu did not have an operations manual like the exemplar, requiring its divers to report such illnesses, so they could be kept out of the water if necessary, thus may have also contributed to cause the accident. This also precludes Kahikolu meeting its difficult burden under the *Pennsylvania* Rule.

3.   Positive Peer Pressure Instead of Competition

Kahikolu fostered and approved deep diving competition among its divers, including Chris MacDonald. Kahikolu's Captain Hunadi described it vividly. TR 1-190 ("If the water is calm, I will stop, lower the ladder in 300 feet of water and let my people swim in the water. All of the crew will get in the water to see who can dive the deepest. They all mess around like that. I don't know how deep they go, but they all go deep. He [MacDonald] has participated in that").

8

Mr. Almaraz testified that in his experience divers are generally competitive. TR 3-159 ("Q. . . . Speaking as a certified diver yourself, a former commercial diver, a dive manager and a general manager, can you tell me whether divers as a class tend to be athletic, competitive people?  A.  Yes, they are").

Kahikolu's own free diving expert Glennon Gingo testified to the same effect, describing an ear barotrauma injury he was aware of personally during an actual free diving competition.  TR 3-228 ("Q.  Did he tell you what caused it?  A.  Yes, he even admitted that he wanted to get his tag, which is how he scores points, he had already felt pain, but he insisted in getting his tag knowing the risk associated with it").

Ironically, one of Kahikolu's main theories in this case was that Mr. MacDonald was a competitive athletic man who just tried too hard.  TR 1-47 (Opening Statement) ("I will submit to you that what you have is a very athletic man who had a chance to show off his ability, his skills, in front of his boss. . . . He was a triathlete, and he thought he could tough his way through it").

In other words, Kahikolu itself suggested Chris was hurt trying too hard to "score points" with his boss, much like the diver in Mr. Gingo's anecdote.

Mr. Almaraz testified that having an operations manual turns that dangerous competitive atmosphere into positive peer pressure -- and promotes a corporate "safety culture" that tends to avoid accidents, instead of foster them.  TR 3-158

9

("Q. . . . Do you feel that it is important to set up written safety procedures from the standpoint of establishing a safety culture at the company? A. Yes. . . . Safety cultures are – I think are very important to an operation, especially if it's offshore because of potential or the inherent chances of risk are higher. The inception of a safety culture develops a safe operation. And what it does basically, is, by having a safety culture, a developed safety culture, you develop peer pressure. It's a type of positive peer pressure but in a safe way. Any crew member who I.D.s one of his team mates, one of his co-workers as doing something unsafe, usually the co-workers will stop them and say: This is unsafe."); TR 3-159-160 ("Q. Does the inculcation of a corporate safety culture have additional importance when you're dealing with the work group involving competitive athletic people? A. Yes, it does. . . . It creates a harness, it creates a safety net to keep them managed. With any procedure, any policy, there are consequences for breaking rules and regs.")

If Kahikolu had a diving operations manual like the exemplar received in evidence, it would have turned its unharnessed diving competition into positive peer pressure to utilize safe descent rates and report illnesses -- instead of its athletic divers like Chris MacDonald trying to "tough it out" to impress their boss.

In this respect also, Kahikolu cannot prove the lack of an operations manual could not possibly have contributed to Chris MacDonald's injury.

B. <u>Causation Under The Traditional Jones Act Standard</u>

With its remand instructions, the Ninth Circuit emphasized the extraordinarily light burden a Jones Act plaintiff normally bears to affirmatively prove causation. The standard is repeated three times:

"whether Kahikolu's failure . . . played any part in producing the injury, no matter how slight" (442 F.3d at 1200);

"if the employer's negligence played *any* part in producing the injury, no matter how slight" (<u>id</u>. at 1203 – emphasis original);

"whether the failure of Kahikolu . . . played any part, even the slightest, in producing Mr. MacDonald's injuries" (<u>id</u>.).

Under that standard, causation is also established, even if the Court views the evidence without application of the *Pennsylvania* Rule. The lack of a policy requiring a safe descent rate alone played at least some role in producing Chris MacDonald's injury. If Kahikolu required a descent rate of no more than 70 feet per minute, as in the exemplar manual, a scuba diver would have necessarily been selected to retrieve the sunken mooring line, thus precluding the accident.

In other words, a proper descent rate would effectively preclude putting athletic, naturally competitive free divers like Chris MacDonald at risk for ear injuries caused by the strong motivation "to get down quickly and then up again quickly," identified by Kahikolu's own expert, Dr. Robert Jackler.

11

C.  <u>Damages</u>

In the original disposition of this case, Your Honor commented that "The Court is extremely sympathetic to the serious injuries suffered by Plaintiff. . . ." <u>Findings of Fact, Conclusions of Law and Order</u>, filed April 28, 2004, at 15.

With that explicit recognition of the gravity of the harm already in the record, and the undisputed fact his injuries are permanent, Plaintiff respectfully leaves determination of an appropriate award to the Court.

III.  <u>CONCLUSION</u>

Plaintiff respectfully requests that the Court enter an Order finding causation either under the *Pennsylvania* Rule's unrebutted presumption, or affirmatively under the traditional Jones Act standard, or both, and a Judgment awarding him an appropriate amount for the serious injuries he has suffered.

DATED: Honolulu, Hawaii, September 8, 2006.

                                        Respectfully submitted,

                                        PATRICK F. McTERNAN
                                        HOWARD G. McPHERSON
                                        JOHN R. HILLSMAN
                                        Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CHRISTOPHER MacDONALD, | ) CIVIL NO. 02-00084 LEK |
| Plaintiff, | ) CERTIFICATE OF SERVICE |
| vs. | ) |
| KAHIKOLU, LTD., dba Frogman Charters, | ) |
| Defendant. | ) |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was duly served on this date by means of facsimile and U. S. Mail, first class postage prepaid, to the following:

> RICHARD WOOTEN, ESQ.
> Cox, Wootton, Griffin, Hansen & Poulos, LLP
> 190 The Embarcadero
> San Francisco, California 94105
>
> Attorney for Defendant
> KAHIKOLU, LTD., dba Frogman Charters

DATED: Honolulu, Hawaii, September 8, 2006.

PATRICK F. McTERNAN
HOWARD G. McPHERSON
JOHN R. HILLSMAN
Attorneys for Plaintiff