COX, WOOTTON, GRIFFIN
HANSEN & POULOS, LLP
Richard C. Wootton (Hawaii SBN 0006815)
190 The Embarcadero
San Francisco, California 94105
Telephone No.: (415) 438-4600
Facsimile No.: (415) 438-4601

Attorneys for Defendant
KAHIKOLU, LTD.
dba Frogman Charters

UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| CHRISTOPHER MacDONALD,<br><br>Plaintiff,<br><br>v.<br><br>KAHIKOLU, LTD. dba Frogman Charters.,<br><br>Defendants. | Case No.: CV 02-00084 ACK LEK<br><br>**DEFENDANT KAHIKOLU, LTD. dba FROGMAN CHARTERS' [PROPOSED] FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER AFTER REMAND**<br><br>**Trial Date: May 20, 2003**<br>**Time: 9:00 a.m.**<br>**Magistrate Judge Leslie Kobayashi** |

This action against Defendant Kahikolu, Ltd. dba Frogman Charters ("Defendant") was filed by Plaintiff Christopher MacDonald ("Plaintiff") on

1

February 12, 2002. The parties consented to trial before a United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73 and LR 73.1. The matter came on for bench trial before the Honorable Leslie E. Kobayashi from May 20 to 22, 2003. Howard G. McPherson and John R. Hillsman appeared on behalf of Plaintiff. Richard C. Wootton appeared on behalf of Defendant. On April 24, 2004, the Court found in favor of Defendant. Plaintiff appealed. The Ninth Circuit remanded the case to the Court with instructions to "determine whether the failure of Kahikolu to comply with Coast Guard regulations played any part, "'even the slightest,'" in producing Mr. MacDonald's injures and enter a new judgment in accordance with that finding." MacDonald v. Kahikolu, 442 F.3d 1199 (9th Cir., 2006). (Citations omitted). On October 27, 2006, after extensive briefing by the parties, the Court heard oral argument concerning the issues noted by the Ninth Circuit's remand order.

This Court has examined with care the sufficiency and weight of the evidence before it, the witnesses who testified at trial, the exhibits submitted by the parties, the trial memoranda submitted by counsel, the Ninth Circuit Court of Appeal's remand order and the briefing and oral argument of counsel post-remand. Pursuant to Fed. R. Civ. P. 52(a), the following constitute the Court's Findings of Fact ("Findings") and Conclusions of Law ("Conclusions") After Remand. To the extent any of the Findings as stated may also be deemed to be Conclusions, they shall also be considered Conclusions. In the same way, to the extent any of the Conclusions as stated may be deemed to be Findings, they shall also be considered Findings. See Miller v. Fenton, 474 U.S. 104, 114-15 (1985).

///

## I.   FINDINGS OF FACT

1. This action arises out of a free-diving incident, which occurred on September 24, 2001, during Plaintiff's employment as a deckhand with Defendant, wherein Plaintiff sustained an ear-related injury during a dive to retrieve a mooring line from the ocean floor. Plaintiff alleges claims of Jones Act negligence and unseaworthiness, and seeks recovery of general and special damages, interest and costs.

2. All matters alleged in the Complaint filed herein occurred within the County of Maui, State of Hawai'I.

3. Plaintiff was born on December 19, 1962, and is 45 years old. His citizenship and residence in the State of California are undisputed.

4. Defendant is a Hawaii business entity operating out of Malaea, Maui, and is in the business of running scuba and snorkel charter tours including to dive/snorkel sites off the Maui coast near, Makena at the Molokini Isle Marine Life Conservation area and "Turtle Town." Defendant is wholly owned by Philip and Lynn Kasper.

5. Defendant employs crewmembers aboard its two vessels whose daily job responsibilities include routinely making free dives, that is, underwater dives without scuba, surface-supplied air, or surface-supplied mixed-gas equipment, as defined by the Coast Guard diving regulations, to depths in excess of 20 feet to secure and release the boats' mooring lines from submerged mooring buoys. (Tr. 1-89:8-91:24, 187:19-188:25, 2-100:8-104:24.)[1]

---

[1] Citations are to the official transcript of the trial designated by volume, page and line number.

3

6. Because the deckhands' duties included free diving, Defendant only hired into the position people with at least a base level of competence in free diving. (Tr. 1-146:10-148:11, 149:15-25, 157:20-158:19.)

7. While conflicting testimony was presented as to Plaintiff's actual level of free diving experience, the evidence demonstrates at the very least that Plaintiff was an experienced swimmer who met a base level of competence in free diving and quickly became an accomplished free diver. This finding is consistent with Lynn Kasper's testimony, Defendant's vice-president and secretary, who testified that the deckhand position Plaintiff applied for was advertised in The Maui News as a position seeking "full time crewmen, free diving skills and driver's license required." (Tr. 1-156:22-24.) The reasonable conclusion, therefore seems to be that some free diving skills were a necessary requirement for securing the position. Regardless, the Court finds that Plaintiff was able to quickly become an accomplished free diver.

8. Once hired, Defendant's general practice was to meet with each new hire and provide only the most rudimentary instruction on free diving. (Tr. 2-95:16-96:14; Na'auao Dep. at 57:19-25, 58:1-13.) Based on the trial testimony of Captain Shawn Hunadi, Lynn Kaspar and Plaintiff, as well as the deposition testimony of Mark Na'auao, the Court finds that Defendant's training of employees about equalizing pressure in one's ears and the risk of barotrauma were, at best, done in an extremely casual manner. (Tr. 1-149:9-25, 157:14-158:13, 2-95:16-96:14, 176:2-3; Na'auao Dep. at 67:2-3.)

9. However, testimony at trial demonstrated and the Court finds that free diving is not an inherently dangerous activity, and safely equalizing pressure is an easily learned skill--often times without formal training and

4

through mere trial and error. (Tr. 3-233:1-19.)

10. On September 24, 2001, Plaintiff was assigned to the FROGMAN II as a deckhand/lifeguard. In addition to Captain Phil Kasper ("Capt. Kasper"), the rest of the crewmembers included Dive Master James Brents ("Mr. Brents") and deckhand/lifeguard Rochelle Miller. (Tr. 1-70:3-17.)

11. When the vessel arrived at Turtle Town, the mooring buoy, which was installed and maintained by the State of Hawai'I; had sunk in 46 feet of water. (Tr. 1-111:4-7, 2-172:5-23.)

12. Plaintiff was asked by Capt. Kasper to get in the water and see if he could locate the mooring line. (Tr. 1-95:15-19, 111:4-7, 2-136:1-138:21, 172:5-23.)

13. Plaintiff quickly located the mooring line on the bottom. (Tr. 1-111:8-9.) After which, Plaintiff, Capt. Kasper and Mr. Brents very briefly discussed how to retrieve the line. (Tr. 1-,112:7-113:21, 2-136:5-24.)

14. Mr. Brents, who was dressed in his scuba diving gear, testified that he told Plaintiff, "Chris, I can get this. It's like 45 feet down there." (Tr. 2-136:12-16.)

15. Plaintiff, who had made similar dives before, assured Capt. Kasper and Mr. Brents that he could make the dive. (Tr. 2-136:12-21.) Plaintiff did not express any question or concern about his ability to do so safely. (Tr. 2-136:25-138:1.) The Court finds, from the testimony presented at trial, that the captain and crew did not force Plaintiff to make the dive, nor did Plaintiff, at any point, claim that he could not or did not want to make the dive.

16. Plaintiff testified that in making his descent to retrieve the mooring line, he cleared three times. (Tr. 1-174:17-175:13.) He cleared twice without difficulty. (Tr. 1-174:17-25.) On the third clearing of his ears, about three feet off the bottom, Plaintiff stated that he heard "a crackling noise in [his left] ear . . . a rice crispy sound or something." (Tr. 1-175:1-5.) Plaintiff then retrieved the line and resurfaced. (Tr. 176:10-22.)

17. After Plaintiff and Mr. Brents tied off the boat, Plaintiff boarded the boat and resumed his deckhand duties. (Tr. 1-176:20-177:17.) Plaintiff testified that he was, at that point, no longer able to hear out of his left ear, and instead heard a buzzing noise similar to an emergency broadcast signal. (Tr. 1-177:24-178:14.) Plaintiff thought that he had water in his ear. (Tr. 1-178:6-10.)

18. Following the accident, Plaintiff was eventually diagnosed with left perilymph fistula and underwent surgery to treat symptoms of hearing loss, dizziness and tinnutitis.

19. Plaintiff worked 86 days and made 120 trips as a deckhand before his injury. (Trial Ex. B), and regularly and frequently made free dives to depths of 30, 40 and 50 feet without apparent ear pain or other ear-related injury. (Tr. 3-105:118-23.) The Court finds, from this evidence, that Plaintiff was an accomplished free diver who, throughout the course of his employment, including from observing and/or talking with other crewmembers and making frequent dives, gained increasing knowledge and experience in this skill. As a result, the Court further finds that Plaintiff was familiar with and knew how to safely equalize pressure in his ears.

20. The Court finds, from the evidence presented that the captain and crew of the Frogman II were extremely experienced and competent. (Tr.

6

1-113:22-115:9, 2-94:6-11, 100:8-104:24, 128:5-131:11.)

21. The Court finds that, prior to Plaintiff's injury, Defendant's employees routinely made thousands of free dives without injury from pressure in their ears and Defendant was not aware of any employees reporting any ear-related injuries. Further, the Court finds no evidence that any crewmember, including Plaintiff, ever raised concerns regarding the lack or effectiveness of free diving training, nor did any crewmember complain of the adequacy of training methods or instruction on methods of equalizing pressure.

22. The Court finds that, at the time of Plaintiff's accident, Defendant did not have knowledge of any unsafe work condition, namely, lack of reasonable training about the risk of barotrauma from forcefully equalizing pressure while free diving.

## II. **CONCLUSIONS OF LAW**

### Jurisdiction

1. This Court has admiralty and general maritime law jurisdiction over this case pursuant to 28 U.S.C. § 1333, as well as under the Jones Act, 46 U.S.C. § 30104, et seq.

### Jones Act Negligence

2. Plaintiff brings the instant action for damages pursuant to the Jones Act, which provides a seaman who is injured through the negligence of his employer a cause of action to recover damages. See 46 U.S.C. § 30104 see also De Zon v. Am. President Lines, 318 U.S. 660, 665 (1943).

3. The parties have stipulated that at the time of his injury on September 24, 2001, Plaintiff was a seaman and Defendant's employee. Plaintiff is therefore entitled to bring an action pursuant to the Jones Act:

> The Jones Act grants "[a]ny seaman who shall suffer personal injury in the course of his employment" the right to seek damages in a jury trial against his employer in the same manner as the Federal Employer's Liability Act (FELA), 45 U.S.C.A. § 51 et seq. allows claims by railroad employees. 46 U.S.C.A. § 688 . . . Such negligence, however, may arise from a dangerous condition on or about the ship, failure to use reasonable care to provide a seaman with a safe place to work, failure to inspect the vessel for hazards and a variety of other breaches of the shipowner's duty of care. Davis v. Hill Engineering, Inc., 549 F.2d 314 (5th Cir. 1977). As with the doctrine of unseaworthiness, contributory negligence and assumption of the risk are not available to bar recovery by a seaman. Jacob v. New York, [315 U.S. 752, 755 (1942)]. Rather, a pure comparative negligence standard applies. Johannessen v. Gulf Trading and Transport Co., 633 F.2d 653 (2d Cir. 1980); 45 U.S.C.A. § 54.

Joyce v. Atlantic Richfield Co., 651 F.2d 676, 681-82 (10th Cir. 1981) (first alteration in original).

4.   Plaintiff contends that Defendant's negligence can be established in either of two ways: first, Defendant was negligent per se for its failure to meet Coast Guard regulations for diving operations, or second, Defendant breached its duty to provide Plaintiff with a safe work environment. See Ribitzki v. Canmar Reading & Bates, Ltd. P'ship, 111 F.3d 658, 662 (9th Cir. 1997) ("The employer of a seaman owes the seaman a duty under the Jones Act to provide the seaman with a safe place to work.") (citations omitted).

A.   **Negligence Per Se**

5.   To prevail on his claim that Defendant was Negligent Per Se Plaintiff must show that his employer's failure to comply with a Coast Guard regulation played any part, even the slightest, in producing his

8

injuries. MacDonald v. Kahikolu Ltd., 442 F.3d 1199, 1203 (9th Cir. 2006) (citing Oglesby v. Southern Pacific Trans. Co., 6 F.3d 603, 607 (9th Cir. 1993) (quoting Bertrand v. Southern Pac. Co., 282 F.2d 569, 573 (9th Cir. 1960); *Kernan v. American Dredging Co.*, 355 U.S. 426 (1958).

6.   Plaintiff argues that Defendant was negligent because it violated Coast Guard diving regulations, 46 CFR §§ 197.200-197.480, and specifically § 197.420(a)(1) – (1), in failing to "provide an operations manual to the person-in-charge prior to the commencement of any diving operation; and … [m]ake an operations manual available at the dive location to all members of the dive team."

7.   Defendant's witness, Shawn Hunadi, who is Defendant's head captain, admitted that to his knowledge there was no operations manual for the dive operations maintained by Defendant. (Tr. 201:8-16.).

8.   However, the Court concludes that the Coast Guard Commercial Diving Regulations apply to scuba divers, that is "a person working beneath the surface, exposed to hyperbaric conditions, and using underwater breathing apparatus," 46 CFR § 197.204.

9.   Plaintiff's argument that a snorkel is an "underwater breathing apparatus," is without merit. Simply put, a snorkel permits a swimmer to breathe underwater only if the swimmer is at or near the water's surface. No evidence was adduced at trial to support the contention that a snorkel provides underwater breathing capability at depths that would expose the swimmer to hyperbaric conditions. The terms used in the Coast Guard diving regulations, as defined therein, focus entirely on divers who are being supplied air or mixed-gas to depths more than several feet below the surface. For instance, "diving mode" is defined for purposes of the

9

regulations as "a type of diving requiring SCUBA, surface-supplied air, or surface-supplied mixed-gas equipment, with related procedures and techniques." Id. While one may argue that "surface-supplied air" may refer to a snorkel, this argument is promptly dispatched as the regulation uses that term in reference to "compressed breathing air." Id.

10. Because the Court finds that Plaintiff was a free diver and <u>not</u> a scuba diver, the Coast Guard diving regulations are inapplicable to the <u>type</u> of diving being performed by Plaintiff.

11. That said, Kahikolu was not in compliance with the Coast Guard's Commercial Diving Regulation § 197.420(a) (1) -- (1), given the presence of Mr. Brents aboard the vessel in scuba diving gear. As such, Kahikolu should have had an operations manual aboard the vessel.

12. Plaintiff's expert, Mr. Almaraz, opined that such a manual would have identified any potential unsafe practices including establishing a safe decent rate, establishing illness reporting requirements and developing a culture of safety aboard the vessel.

13. Other than the testimony of Mr. Almaraz, this Court finds little, if any, evidence to support the Plaintiff's contention that the absence of a dive manual aboard the vessel contributed, even in the slightest, to the Plaintiff's injuries.

14. Defendant on the other hand, provided ample evidence through its expert Glennon Gingo, who has far more knowledge, experience and expertise in the field of free diving than Mr. Almaraz that the free diving engaged in by the Plaintiff was not inherently dangerous. Safely equalizing pressure in ones ear is an easily learned skill that does not require formal training and the Plaintiff was an accomplished free diver who was familiar

with and knew how to equalize the pressure in his ears. The applicable regulations requiring an operations manual are simply void of any discussion relating to free diving. Plaintiff has failed to offer admissible, non-speculative evidence sufficient to show otherwise. The Court concludes that the failure of Kahikolu to comply with the applicable Coast Guard regulations did not play any part, <u>not even the even the slightest</u>, in producing Mr. MacDonald's injuries.

15.    Finally, this Court declines Plaintiff's invitation, based in large part on the Alaska Supreme Court's decision in *Marine Solution Services v. Horton*, 70 P.3d 393 (Alaska 2003), to apply the Pennsylvania Rule to this non-collision, Jones Act case.

In <u>Marine Solution Services</u>, the Alaska Supreme Court cited <u>Mathes v. The Clipper Fleet</u>, 774 F.2d 980 (9th Cir. 1985) as precedent for applying the Pennsylvania Rule in Jones Act cases. However a careful reading of <u>Mathes</u> reveals that the case did not involve a Jones Act claim and held that the rule did not apply. In fact none of the cases cited by *Mathes* for the proposition that "[the] Pennsylvania Rule has often been applied in" the Ninth Circuit are Jones Act cases.[2] In short, the Alaska Supreme Court failed to cite a single Jones Act case in the Ninth or any other Circuit finding liability in a non-collision Jones Act case because of application of the *Pennsylvania* rule. It also ignored the fundamental ruling of the *Matthes*

---

[2] *Waterman Steamship Corp. v. Gay Cottons*, 441 F.2d 724 (9th Cir., 1969) involved cargo damage arising out of a vessel stranding; *States Steamship Co. v. Permanente Steamship Corp.*, 231 F.2d 82 (9thCir. 1956) involved a collision; *The Denali*, 105 F.2d 413 (9th Cir. 1939) involved a stranding; *The Princess Sophia*, 61 F.2ds 339 (9th Cir. 1932), also involved a collision. All of these cases involved violation of navigation and collision avoidance regulations. *See, also, Pennzoil Producing Co. v. Offshore Express, Inc.,et al.*, 943 F.3d 1465 (5th Cir. 1991), *Candies Towing Co. v. M?V B & C Eserman*, 5th Cir. 1982), cited by the *Marine Solutions Court*, which involved an allision and a grounding, respectively.

11

Court, which refused to find liability based on the *Pennsylvania* rule because of the limited scope of that rule.

In *Matthes,* the Ninth Circuit rejected application of the rule because:

> We agree with the district court that this violation does not bring into play the *Pennsylvania* Rule because there is ***no conceivable causal connection between the violation and the injury***. As the Supreme Court said in *The Pennsylvania* itself, "it must be conceded that if it clearly appears the fault could have had nothing to do with the disaster, it may be dismissed from consideration." 86 U.S. [19 Wall.] at 136. *See also Gosnell v. United States*, 262 F.2d 559, 563 (4th Cir. 1959)(***"where it [is] evident that the breach of statutory duty . . . did not cause the accident"*** the *Pennsylvania* Rule does not apply); *Seaboard Tug & Barge v. Rederi AB/Disa*, 213 F.2d 772, 775 (1st Cir. 1954) (in applying the *Pennsylvania* Rule, ***the courts "are limited to the reasonable possibilities"***) (quoting *The Mabel*, 35 F.2d 731, 732 (2d Cir. 1929)).

*Id.* (emphasis added).

In the present case, there is no compelling reason to shift the changing burden of proof regarding the safety violation from appellant to Kahikolu. The regulation violated by Kahikolu had nothing to do with avoiding collisions or even the navigation of a vessel. Further, as noted above, there is simply no nexus between the violation complained of and the injury suffered by Plaintiff. Finally, even if the Pennsylvania rule were to apply in this case, Defendant has more than met its burden of showing that the failure to have a dive manual aboard the vessel could not have been even a contributing cause of the Plaintiff's injuries.

### B. Negligence - Unsafe Work Condition

16.  To prevail on his claim that Defendant failed to provide a safe place to work, Plaintiff must show, by a preponderance of the evidence, the elements of a Jones Act negligence claim.

12

17. "The elements of a Jones Act negligence claim are: duty, breach, notice and causation." Ribitzki, 111 F.3d at 662 (citing Havens v. F/T Polar Mist., -996 F.2d 215, 218 (9th Cir. 1993)).

18. The law does not require that the employer provide an injury-free workplace. A shipowner has the duty to use reasonable care in furnishing his employees with a safe place to work. See Yehia v. Rouge Steel Corp., 898 F.2d 1178, 1184 (6th Cir. 1990). While proof of negligence is essential to recovery under the Jones Act, see Jacob v. City of New York, 315 U.S. 752, 755 (1942), the quantum of evidence necessary to prove negligence is slight. See Ward v. Am. Haw. Cruises, Inc., 719 F. Supp. 915, 922 (D. Haw. 1988) ("Under the Jones Act, even the slightest negligence is sufficient to sustain a finding of liability."); see also Havens, 996 F.2d at 2'18.

19. Mindful of this standard of proof, the Court concludes that, given Defendant's lack of formal free diving training and that existing training was done in an extremely casual manner, Defendant breached its duty to provide a safe place to work.

20. Although the duty to provide a safe ship is broad, the employer must have notice and the opportunity to correct an unsafe condition before liability will attach. See Colburn v. Bunge Towing, Inc., 883 F.2d 372, 374 (5th Cir. 1989). "It is a fundamental principle that, under the Jones Act, an employer must have notice and the opportunity to correct an unsafe condition before liability will attach." Perkins v. Am. Elec. Power Fuel Supply, Inc., 246- F.3d 593, 599 (6th Cir. 2001) (internal quotation marks and citation omitted). Negligence under the Jones Act requires a defendant to guard against only those risks or dangers of which it knew, or by the

13

exercise of due care, should have known, and Defendant's duty in the instant case is, thus, limited to hazards it could have foreseen or that it had notice of.

21. In the Ninth Circuit, "notice" is established when an employer or its agents either <u>knew</u> or <u>should have known</u> of the dangerous condition." <u>Ribitzki,</u> 111 F.3d at 662 (emphasis in original); <u>see also</u> <u>Havens,</u> 996 F.2d at 218 ("There must be some evidence from which the trier of fact can infer that the owner either knew, or in the exercise of due care, should have known of the unsafe condition.").

22. The Court concludes that there is no credible evidence from which it can infer that Defendant was aware, or should-have been aware, of the unsafe work condition posed by the lack of reasonable training. Rather, the testimony at trial established, and the Court found, that Plaintiff was an experienced free diver who had regularly and successfully made free dives to depths of thirty feet or deeper without ear-pain or injury during his 120 trips with Defendant and who was familiar with and knew how to safely equalize; and that Defendant's employees had made thousands of free dives without injury from pressure in their ears.

23. The Court also considered, and found significant, evidence that Defendant screened its applicants to hire only those individuals who had experience free diving. While this does not eliminate Defendant's duty to provide some formalized training in this area, it is relevant, however, to the question of whether Defendant was on notice as to the effectiveness or adequacy of its "casual" training methods and lack of reasonable training regarding the risk of barotrauma from forcefully equalizing pressure. In particular, it goes to the issue of whether it was foreseeable that this level and type of training would result in risk of injury. <u>See</u> <u>Perkins,</u> 246 F.3d at

14

599 (noting that a defendant's duty to protect extends only to foreseeable risks of harm); see also Ribitzki, 111 F.3d at 663. Given Defendant's practice of hiring individuals with at least a base level of competence in free diving, therefore, Defendant could not reasonably have foreseen or have been expected to know that its casual training methods posed an unsafe work condition.

24. Further, there was no evidence that any crewmembers, including Plaintiff, had ever experienced ear pain or barotrauma or complained to Defendant about the possibility of such injury or the adequacy of Defendant's training regarding equalizing pressure.

25. Accordingly, the facts and circumstances provide no reasonable basis for this Court to conclude that barotrauma injury was a foreseeable risk, and the Court concludes, after hearing all of the testimony and carefully considering the evidence presented at trial, that Plaintiff has failed to establish Defendant's knowledge of the unsafe work condition.

26. In sum, this is not a case where Plaintiff was performing inherently dangerous work, or where Plaintiff had no diving knowledge, training or experience. See, e.g., Marmo v. Chicago, Rock Island & Pac. R.R. Co., 350 F.2d 236, 239 (7th Cir. 1965) (finding negligence where work was dangerous and plaintiff had no knowledge, training or experience in that work); Phillips v. Chesapeake & Ohio Ry. Co., 475 F.2d 22, 24 (4th Cir. 1973) (finding a breach of duty to train where practice that resulted in plaintiff's injury was "unsafe"). Rather, the evidence conclusively established that free diving is not inherently dangerous, Plaintiff was an experienced swimmer and competent free diver who regularly made free dives to depths of thirty feet or deeper without ear pain or ear-related injury,

and that Defendant's employees had successfully made thousands of free dives to those depths without injury. While the Court is extremely sympathetic to the serious injuries suffered by Plaintiff, he has presented no evidence that this was anything more than an unfortunate severe injury suffered during the execution of a frequent, routine dive. The mere fact of injury is not sufficient. See Marvin v. Cent. Gulf Lines, Inc., 554 F.2d 1295, 1297 (5th Cir. 1977). A plaintiff under the Jones Act must establish the elements of negligence--duty, breach, notice and causation--which Plaintiff has here failed to do.

### Seaworthiness

27. Plaintiff also seeks to recover damages pursuant to his claim for unseaworthiness, which is a cause of action distinct from Jones Act negligence.

28. General maritime law imposes a duty upon shipowners to provide seaworthy vessels. See Carlisle Packing Co. v. Sandanger, 259 U.S. 255, 258 (1922). The duty is absolute and extends to the vessel, its equipment and crew:

> This duty requires that the vessel, as well as its gear and crew, be reasonably fit for their intended use. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 502-03 (1971); see also Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960) (duty of shipowner only entails furnishing a vessel and appurtenances reasonably fit for their intended use); Garrett v. Moore McCormack Co., 317 U.S. 239, 240 n.2 (1942) (duty to exercise reasonable care is independent of a vessel owner's duty to provide a seaworthy ship). It is an absolute duty, completely independent of the duty of reasonable care mandated by the Jones Act. Mitchell, 362 U.S. at 549.

Watson v. Hollywood Casino-Aurora, Inc., No. 95C 654, 1996 WL 559960, at *3 (N.D. Ill. Sept. 30, 1996). While the duty is absolute, "an owner is not obligated to furnish an accident-free ship. The standard is not perfection, but reasonable fitness; not a ship that will weather every imaginable peril of the sea, but a vessel reasonably suitable for its intended service." Id. (quoting Mitchell, 362 U.S. at 550).

29. To sustain his claim for unseaworthiness, Plaintiff "must establish: (1) the warranty of seaworthiness extended to him and his duties; (2) his injury was caused by a piece of the ship's equipment or an appurtenant appliance; (3) the equipment used was not reasonably fit for its intended use; and (4) the unseaworthy condition proximately caused his injuries." Ribitzki, 111 F.3d at 664 (citations omitted).

30. As the parties have stipulated that Plaintiff was a seaman, the warranty of seaworthiness was extended to him. The injury of which Plaintiff complains occurred while he was free diving off of the vessel. Thus, the pivotal issue is whether or not the dive procedure and crew were reasonably fit for their intended purpose.

31. As to the dive procedure, the Court's conclusion that Defendant breached its duty of care to provide a safe work place does not necessarily render the Frogman II unseaworthy. See Earles v. Union Barge Line Corp., 486 F.2d 1097, 1104 (3d Cir. 1973) ("The breach of the duty to use reasonable care to provide a safe place to work, without more, does not necessarily result in liability for unseaworthiness.").

32. As to the captain and crew of the Frogman II, the Court found that they were extremely experienced and competent, and did not force Plaintiff to perform a task he could not safely perform or did not want to do.

33. Merely because an injury occurs does not establish, under the general maritime doctrine of seaworthiness, that the vessel was unseaworthy. Plaintiff has failed to prove by a preponderance of the evidence unseaworthiness, and the Court therefore concludes, under the facts of this case, that the Frogman II was seaworthy. See Matter of Hechinger, 890 F.2d 202, 208 (9th Cir. 1989) (no liability for unseaworthiness where skipper and crew were competent).

## ORDER

AND NOW, following the conclusion of a bench trial in this matter, and in accordance with the foregoing Findings of Fact and Conclusions of Law, it is HEREBY ORDERED that judgment shall enter in favor of Defendant and against Plaintiff in the above matter.

Dated: November 29, 2007

COX, WOOTTON, GRIFFIN,
HANSEN & POULOS, LLP
Attorneys for Defendant KAHIKOLU, LTD.
dba Frogman Charters

By: _____
Richard C. Wootton